A. Henry "Hank" SOAR et al.

v.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION et al.

Civ. A. No. 4986.

United States District Court,
D. Rhode Island.

Dec. 2, 1975.*

* The Court did not originally intend to publish this Opinion. However, it is now doing so because of the requests it has received that it take such action.

Leonard Decof, Raymond W. Monaco, Providence, R. I., for plaintiffs.

Edward F. Hindle and Stephen A. Fanning, Jr., Thomas Gidley, James A. Jackson, Thomas Quinn, Providence, R. I., Edward M. Glennon, Minneapolis, Minn., for defendants.

## OPINION

PETTINE, Chief Judge.

This is a class action brought on behalf of professional football players who played in the National Football League prior to the

1959 season. Defendants are the National Football League (NFL) and two of its officers, Pete Rozelle and James Kensil and the National Football League Players Association (NFLPA) and two of its officers, William Curry and Edward Garvey. Plaintiffs seek recovery of certain funds allegedly due them in connection with a pension fund trust agreement originally established on April 23, 1959 and executed in 1962, entitled the "Bert Bell NFL Player Retirement Plan."

The plaintiffs' Second Amended Complaint sets out four counts. Count II is a claim for breach of an alleged oral contract, allegedly entered into in 1959 between the "NFLPA" on behalf of the plaintiffs and the "NFL" by its then commissioner Bert Bell. Plaintiffs contend that this oral contract provided for the inclusion in a pension plan of players who retired prior to the 1959 NFL season and for the inclusion of pension credit for all years of service in the NFL prior to 1959 if a pension plan was established by the League and if sufficient funds became available to permit the pension trust to be amended to provide benefits for those players. As consideration for that alleged oral contract, plaintiffs contend that they and the "NFLPA" forbore from the bringing of an anti-trust suit against the "NFL".

In Counts I, III and IV, plaintiffs contend that the "NFLPA" defendants, with the knowledge and complicity of the "NFL" defendants, breached a fiduciary and contractual duty to obtain pension benefits for them substantially identical to those now in force for professional football players now covered by the "Bert Bell Retirement Plan" and that the present "NFLPA" has wrongfully usurped the original "NFLPA" as founded by the plaintiffs as signatory to the pension plan. Relief sought in all four counts is the declaration of a resulting or constructive trust in favor of plaintiffs and the inclusion of plaintiffs in the "Bert Bell Retirement Plan" upon the same terms and conditions as the present beneficiaries thereof, or the establishment by the defendants of a trust with corpus sufficient to provide such benefits to plaintiffs; or the payment by the defendants to the plaintiffs of a sum sufficient to establish such a trust. Plaintiffs also seek money damages equal to the loss of retirement income from the inception of the trust and an accounting of all monies placed in the trust and all monies to be placed in the trust.

This case is presently before the Court on motions for summary judgment by the "NFL" defendants and the "NFLPA" defendants and alternatively for the "NFLPA" defendants on a motion to dismiss the action as a class action. The "NFL" defendants contend that they are entitled to judgment as a matter of law on four grounds:

1. The alleged oral contract was not made with a person authorized to bind the "NFL";

2. The alleged oral agreement is too indefinite to be enforceable as a contract;

3. There was no legal consideration on behalf of plaintiffs to support the alleged contract;

4. This action is barred by the Statute of Limitations. R.I.G.L. Ann. 9–1–13 (1956).[1]

The "NFLPA" defendants argue they are similarly entitled to summary judgment because:

1. There is no evidence in the record of a contract between the plaintiffs and these defendants;

2. They are under no fiduciary duty to negotiate with the "NFL" for the inclusion of the plaintiffs in the pension plan;

3. As a result of recent developments in labor law these defendants have no ability to require negotiations with the "NFL" for inclusion of the plaintiffs in the pension plan.

---

1. In their pretrial memorandum, the "NFL" defendants also argued that the plaintiffs' cause of action is barred by the Rhode Island Statute of Frauds, but they are apparently not pursuing this contention at this time.

In the alternative, the "NFLPA" defendants seek dismissal of this action as a class action because the plaintiffs, since filing this suit in 1972, have made no effort to have this case certified as a class action.

## I. CHRONOLOGY

The "NFLPA" was founded in late 1956. Creighton Miller served as counsel to the Association and the original officers elected in 1958 were Bill Howton, Kyle Rote and Bill Pellington. The Association's principal objective at that time was to gain official recognition by the "NFL" member clubs of their representational status with respect to all player-employees and thereby to obtain for the players improved working conditions, salaries, etc. and the approval of a pension plan for "NFL" players. Sometime in the fall of 1957, the Players Association representatives, believing the "NFL" had not been responsive to their demands for recognition, considered the possibility of instituting an anti-trust suit against the "NFL". At Commissioner Bell's request, the Association agreed to postpone filing the suit until the "NFL" owners met with the Commissioner in December. At that December meeting the owners of the "NFL" member teams recognized the Players Association and granted certain demands regarding working conditions and salary.

The officers of the Players Association first discussed with Commissioner Bell and representatives of the "NFL" member teams the possibility of establishing a pension plan in January 1958. It was agreed that there would be a subsequent meeting in May 1958 at which William Dudley, a retired "NFL" player, would present a draft pension plan. At the May meeting, Dudley presented a draft pension plan prepared with the assistance of a Richmond, Virginia actuarial firm. The plan provided for eligibility for players active in the 1958 season who thereafter would play for five seasons in satisfaction of a five-year vesting requirement and provided for contributions to the plan by active "NFL" players. No agreement was reached at this meeting on this or any other plan.

In November 1958, the Players Association again considered bringing an anti-trust suit against the "NFL". At a January 1959 meeting with the owners, the Association threatened to file suit unless the owners gave serious consideration to establishing a pension plan. Following the January meeting Sigmund Hyman of Baltimore began assisting the "NFL" member teams in drafting a plan and the "NFLPA" decided not to file their lawsuit. On April 23, 1959, the member teams approved a pension plan for the "NFL" players. The plan would provide for eligibility for those players active in 1959 who thereafter played five years in the League (including the 1959 season). It was hoped the plan could be completely funded by the "NFL" member teams without player contributions. The actual pension trust agreement was executed in 1962 after a lengthy investigation of possible funding sources, and the first funds were paid into the trust that year. The plan was approved by the Internal Revenue Service as a qualified plan under 26 U.S.C. sec. 401 in March 1963. Bert Bell died in October 1959 and was replaced in January 1960 by defendant Pete Rozelle.

In October 1964, the "NFL" member teams amended the plan to permit players active in 1959 to utilize their seasons of "NFL" service prior to 1959 in order to satisfy the five-year vesting requirement. To the present time, however, there have been no amendments to the 1962 agreement to permit vested players to utilize pre-1959 service for any purpose other than to satisfy the vesting requirement or to permit players who retired prior to 1959 to become eligible under the plan for any benefits whatsoever. An "NFL" alumni fund separate from the pension trust has been established by the "NFL" member teams for the purpose of assisting former "NFL" players including the plaintiffs, who by reason of illness or adversity are financially in need.

## II. COUNT II

The plaintiffs contend that in 1959, in the course of negotiations and discussions of

proposed pension plans described *supra,* an oral contract was entered into between the "NFLPA" on behalf of the plaintiffs and the "NFL" by its Commissioner Bert Bell providing for the inclusion in any subsequently adopted pension plan of players who retired prior to 1959 and for the inclusion of pension credit for all years of service in the "NFL" prior to 1959 if a pension plan was ultimately established and if sufficient funds became available to permit extension of benefits to those players. In support of their motion for summary judgment, the "NFL" defendants have argued that no such contract was ever agreed to and that, even if it had been agreed to, it would not be enforceable.

█ Federal Rule of Civil Procedure 56(c) provides in pertinent part that summary judgment

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In considering a motion for summary judgment, of course, "we look at the record . . in the light most favorable to . . . the party opposing the motion." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464 at 473, 82 S.Ct. 486 at 491, 7 L.Ed.2d 458 (1962). Nevertheless, it must be remembered that "[w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253 at 289–90, 88 S.Ct. 1575 at 1592, 20 L.Ed.2d 569 (1968).

## A. THE EXISTENCE OF AN ORAL AGREEMENT

█ According to plaintiffs' answers to interrogatories served upon them by the defendants, only four persons were authorized to negotiate on behalf of the plaintiffs and the original "NFLPA", were involved in discussions with Commissioner Bell concerning the pension plan, and were parties, representing the "NFLPA" and the plaintiffs, to the alleged contract reached with Commissioner Bell. These four were Creighton Miller, counsel to the original "NFLPA", and Bill Pellington, Bill Howton and Kyle Rote, officers of the "NFLPA". Also involved in the discussions was William Dudley, a retired "NFL" player who served as a consultant on possible pension plans for the "NFL" players. The "NFL" defendants have taken the depositions of these five potential witnesses for the plaintiffs and argue that even when they are interpreted most favorably to the plaintiffs, they provide absolutely no basis for a reasonable person to conclude that an oral agreement of the type alleged by the plaintiffs was in fact reached between Commissioner Bell and representatives of the Players Association.

The "NFL" defendants are correct that the depositions of Miller, Pellington and Dudley lend little support to the plaintiffs' position and on the contrary provide strong evidence that no such oral agreement was reached. Nevertheless, upon review of the depositions of Rote and Howton, I cannot conclude that there is no genuine dispute of the material fact of the existence of the agreement. Howton in particular described a meeting he had with Commissioner Bell on April 23, 1959 in Philadelphia following the "NFL" owners agreement to a pension plan that did not provide benefits for the plaintiffs and quoted Bell as saying, "Look, I assure you the money will go to retroactive benefits." (Howton Dep. 80) Although Howton conceded that Bell had not indicated whether the owners had such an intention, he reported that "[Bell] just told me himself in the form of giving me his word that when the funds were available we could spend it retroactively." (*Id.* at 81–82). Thus, it appears that the existence of an agreement between Bell and the "NFLPA" is an issue of fact appropriate for determination by trial. Such a conclusion, of course, does not preclude a grant of

summary judgment for the defendants if this agreement, even if it does exist, does not constitute an enforceable contract.

## B. COMMISSIONER BELL'S AUTHORITY TO ENTER INTO A CONTRACT WITH THE NATIONAL FOOTBALL LEAGUE

■ It is undisputed that if an agreement was reached between the plaintiffs through the old "NFLPA" and the "NFL" regarding pension coverage for plaintiff football players, such agreement was reached with Commissioner Bell as the representative of the "NFL" team owners. It is also undisputed that in accordance with the bylaws of the National Football League, in effect before and during the negotiations allegedly culminating in the contract in question, the "NFL" commissioner had no actual authority to bind the League to contracts unless such agreements were voted on and approved by the member clubs.[2] Finally, it is further undisputed that owners of the "NFL" member teams never officially ratified or approved by vote any agreement that may have been entered into between plaintiffs and Commissioner Bell of the nature described by plaintiffs.[3] The plaintiffs contend, however, that Commissioner Bell had apparent authority to act as the agent of the "NFL" and thereby bind the League to a contractual agreement. To establish the apparent authority of an agent to do a certain act, facts must be shown that the principal has manifestly consented to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; that a third person knew of the fact and, acting in good faith, had reason to believe and did actually believe that the agent possessed such authority; and that the third person, relying on such appearance of authority,

has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal. *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 159 P.2d 958 (1945); *Wen Kroy Realty Co. v. Public National Bank & Trust Co.*, 260 N.Y. 84, 183 N.E. 73 (1932).

■ The undisputed facts of this case could not justify a reasonable person finding that Commissioner Bell was endowed with apparent authority to bind the League during his pension negotiations with the plaintiffs. Plaintiffs' only evidence in support of their contention are the facts that Commissioner Bell played a dominant role in the pension negotiations on behalf of the "NFL", that newspaper articles often portrayed Bell as acting for the "NFL", and that at no time did anyone explicitly advise the plaintiffs or their attorney that Bell did not have the authority to bind the League. Plaintiffs have produced no evidence indicating that any of the four persons representing the "NFLPA" actually believed that Bell had the authority to bind the League to a contract not approved by vote of the member clubs, a fact which must be established to justify a finding of apparent authority. On the contrary, the deposition of plaintiff Kyle Rote referred to a statement made by Commissioner Bell that Bell would resign if the "NFL" owners did not approve a pension plan covering at least active players. This clearly indicates that Rote knew, or should have known, from Bell's statement that pension plans require the approval of the "NFL" team owners. Furthermore, it is significant that all four representatives of the "NFLPA" with the possible exception of Miller, who was a lawyer, had many years of experience as players in the National Football League and thus, entered negotiations with Bell not as uninitiated outsiders, but as persons with

---

**2.** "He [the commissioner] is empowered to negotiate contracts on working agreements on behalf of the League with other leagues, persons, corporations or partnerships which shall be presented to the National Football League for approval before execution. A ten-twelfths ($^{10}/_{12}$) vote of the membership be required for approval." NFL By-Laws, Article 1, sec. 19.

**3.** The evidence does indicate that several of the owners such as Edwin Anderson and Carroll Rosenbloom may have indicated to the plaintiffs that they supported extension of pension coverage to the older players, but such remarks can hardly be considered a ratification of alleged contract with Bell.

an inside knowledge of the organization and governance of professional football.

The plaintiffs, in a letter to the Court following oral argument, cite in particular the deposition of William Dudley who testified that one of Bell's statements, that older players should have pension coverage, was made in the presence of and concurred in by several owners. At best this and other evidence relied on by the plaintiffs may indicate that Bell and several of the owners expressed the hope of providing for the older players at some future date and that these sentiments may have led to some confusion on the part of the plaintiffs in April 1959 as to the exact nature of the pension plan voted on by the owners on that day. It is undisputed, however, that the pension plan, in fact voted on by the owners, did not provide coverage for the plaintiffs; and the evidence the plaintiffs have cited does not provide a factual basis to support their contention that representatives of the Players Association actually believed that Bell, or even several owners acting on their own, had the authority to bind the League to the alleged contract. Since no reasonable person could find on the basis of the evidence before this Court, even construed most favorably to the plaintiffs, that Commissioner Bell had either actual or apparent authority to bind the "NFL" to a pension agreement, all the defendants are entitled to summary judgment on Count II of the Second Amended Complaint. Plaintiffs cannot demonstrate that there was a contract entered into by a person authorized to do so on behalf of the "NFL", so their claims for breach of contract must fail. Even if there were a genuine factual dispute on the question of Commissioner Bell's apparent authority, however, the defendants would still be entitled to summary judgment on the grounds that the alleged contract is too indefinite to be enforced and that it was not supported by a legal consideration.

## C. INDEFINITENESS

■ Elementary to the establishment of any valid contract is a "meeting of the minds" on the essential elements of that contract. 1 *Corbin on Contracts,* § 107 (1963).

> "A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think they have made a contract; they must have expressed their intentions in a manner that is capable of understanding." *Id.* § 95 at 394.

■ The alleged oral contract in question here, agreed to in 1959, provided for retroactive pension coverage for the plaintiffs *if* a pension plan were established, and *if* sufficient funds became available. The "NFL" defendants argue that this contract is fatally indefinite because it does not specify the terms of eligibility or schedule of benefits and this Court agrees.

The plaintiffs argue that the contract in question was merely an agreement in principle with the specifics to be worked out later. They argue that the intent of the parties with regard to these specifics is a factual question to be determined by the fact finder at trial. The fact finder's deliberations, plaintiffs contend, would be guided by the basic principle agreed to by the parties that benefits would be provided on the same terms as those provided presently covered players. This principle would be of little help to a jury charged with determining how the parties would have resolved the following complicated questions that would have to be answered before the contract could be carried out. Would the pension plan cover players in the old American Football Conference, some of whose players and teams joined the NFL? Would there be special treatment for players whose careers were disrupted by World War II? Would coverage be extended to players on now defunct teams, and if so, would this disqualify the plan for IRS purposes?

The alleged contract is also fatally indefinite regarding time of performance. What does it mean to say the players will be included when "sufficient" funds are available? It may even be that the sufficient available funds condition may have been

literally impossible to meet ever since 1963 when the pension plan was amended as a condition of IRS approval. Thereafter, every dollar within the plan has been earmarked to provide benefits for players already in the plan and no surplus could ever develop to provide benefits for anyone else.

### D. CONSIDERATION

■ The Court also agrees with the "NFL" defendants' contention that there was no legal consideration given for the alleged promise by Commissioner Bell to provide plaintiffs' pension coverage. The plaintiffs argue that their forebearance of bringing an anti-trust suit against the League was the consideration. While it is true forebearance of some legal right may constitute consideration, such forebearance must be "bargained for and given in exchange for the promise." Restatement, Contract § 75. See also 1 *Williston on Contracts*, § 135, p. 567.

■ The evidence before the Court indicates that there were two occasions when the plaintiffs threatened the owners with an anti-trust suit and then decided not to sue. Neither occasion is connected in any way with Bell's promise. The first threat was used solely to obtain recognition of the "NFLPA" by the "NFL", and the second solely to force the owners to seriously *consider* establishing a pension plan (i. e. not necessarily to *agree* to a *particular* plan). Therefore, even if "NFLPA" forbore from bringing suit after Bell's promise, there is absolutely no evidence that Bell in any way bargained for this forebearance, and it therefore cannot qualify as consideration.

### III. COUNTS I, III and IV

Having granted summary judgment on Count II on the grounds that no reasonable interpretation of the evidence before the Court could justify a finding that there was a binding and enforceable contract between the old Players Association and the "NFL", a key question remaining is, what effect such a conclusion has on the remaining counts. That is, are Counts I, III and IV, concerning an alleged fiduciary duty on the part of the present Players Association to seek pension coverage for the plaintiffs, premised on a contract between the Players Association and the "NFL"; or do these counts state a cause of action which could reasonably be supported by the evidence before the Court in spite of the Court's ruling on Count II?

■ The wording of these counts in the complaint itself does not indicate that the alleged fiduciary relationship was premised on the alleged contract with the "NFL". The plaintiffs' memorandum in objection to the "NFLPA" defendants' motion for summary judgment, however, twice (at 4 and 10–11) asserts that they are not asking the "NFLPA" to bargain with the "NFL" to establish pension coverage for the plaintiffs, but merely to administer the agreement they alleged already entitles them to benefits (that is, the contract alleged in Count II). On this basis alone, the defendants are entitled to summary judgment on the remaining counts. Even if Counts I, III and IV were independent of Count II, however, they would fail.

The plaintiffs put forth several theories justifying their claim that the "NFLPA" is obliged to seek pension coverage for the plaintiffs. One appears based on the syllogism:

1. Retired players can be members of "NFLPA" under the by-laws.
2. A major purpose of "NFLPA" is to obtain pension benefits for its members.
3. Therefore, "NFLPA" is obliged to obtain benefits for the plaintiffs.

Even if propositions 1 and 2 are correct, it does not follow that the "NFLPA" cannot decide in good faith that its resources and bargaining leverage would be better spent seeking other goals for the benefits of other members. It is not alleged that the Players Association's exclusive, or even pri-

mary, purpose is to obtain pension benefits for its members.

 Second, plaintiffs argue the "NFLPA" is bound by a contract with the plaintiffs based on promissory estoppel to seek pension benefits for them. Plaintiffs allege that they have relied to their detriment on repeated promises by the "NFLPA" that pension coverage would be sought. Plaintiffs have presented no evidence that they have suffered any detriment, however, since they argue only that in reliance on the "NFLPA" promises, they forebore bringing a suit to obtain pension benefits, and this very case indicates that such a suit would bear no fruit. Further, plaintiffs have offered no evidence that the "NFLPA" promises were made for the purpose of inducing plaintiffs to so forebear, an element required to establish promissory estoppel under Rhode Island law. *Lichtenstein v. Parness,* 81 R.I. 135, 99 A.2d 3.

Finally, plaintiffs argue that the "NFLPA" defendants have somehow wrongly usurped the position of plaintiffs as beneficiaries of the present pension plan, and have therefore unjustly enriched themselves at plaintiffs' expense. There is no dispute that all present officers of the Association were legitimately chosen in a legitimate line of succession from officers of the original Players Association, and the plaintiffs have cited no evidence that could support such a charge of usurpation.

I conclude, therefore, that no reasonable interpretation of the evidence before the Court could support a finding that the "NFLPA" defendants have violated a fiduciary duty to the plaintiffs to seek pension benefits on their behalf. Defendants are entitled to summary judgment on Counts I, III and IV.

The remaining issues raised by the parties such as the Statute of Limitations question and the motion to dismiss this action as a class action need not be reached.

Motions for summary judgment are hereby granted. Defendants will prepare an order accordingly.