[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This case is before the Court for decision following a non-jury trial on the first amended complaint of plaintiff, The Jotorok Group, Inc. ("Jotorok"), against defendant Computer Enterprises, Inc. ("CEI"). Jotorok seeks recovery under a claim of breach of contract. CEI argues that it never entered into a binding contract with Jotorok. For the reasons set forth below, this Court holds that Jotorok has not met its burden of proving that a binding agreement existed between the parties such that judgment must enter in favor of defendant CEI.
 FACTUAL BACKGROUND[1] AND PROCEDURALHISTORY
Jotorok Group Inc. is a Rhode Island corporation engaged in the business of providing temporary and permanent employment placement. On July 11, 2000, Jotorok entered into a contract with Crescent Systems, LLC. ("Crescent"). Pursuant to that contract, Crescent agreed to provide Jotorok with the services of Jimmy Jolly though January 15, 2001. (Joint Ex. 10) Jotorok, in turn, placed Jolly with one of Jotorok's clients, PepsiCo, Inc. ("Pepsi"), until January 17, 2001. (Joint Ex. 11) At the time of these assignments, however, Jolly was actually directly employed by Transworld Information Systems, Inc. ("TIS"). (Joint Ex. 8) TIS had entered into a contract with Crescent, whereby Crescent paid TIS a fee in return for the use of Jolly's services. (Joint Ex. 9)
In December 2000, Jolly apparently notified Jotorok that CEI, a Pennsylvania corporation in the business of providing computer consulting services, had displaced Crescent as his visa sponsor.[2] There is no indication, however, that TIS in any way assigned its rights regarding Jolly to CEI.[3] Still, Jolly apparently informed Jotorok or he and Jotorok agreed that any contact regarding his employment should thereafter be directed to CEI, not Crescent or TIS. Shortly thereafter, Pepsi indicated to both Jolly and Jotorok that it was interested in extending Jolly's services beyond January 15, 2001. Jolly's contract with TIS, however, prevented him from renewing his placement at Pepsi without TIS' authorization. (Joint Ex. 8) CEI asserts that Jotorok was aware of that restriction in Jolly's contract with TIS.[4] Jotorok, on the other hand, contends that at no time prior to January 17, 2001 did it know the terms of any contract between Crescent and TIS concerning Jolly.
On December 12, 2000, Richard Reed of Jotorok and Jennifer Freedberg of CEI had a meeting at which they orally negotiated the terms of an agreement regarding Jolly's renewed placement at Pepsi.[5] During this negotiation, the parties discussed several items, including the proposition that Jotorok would pay CEI $75.00 per hour for Jolly's services to Pepsi after January 15, 2001. (Joint Ex. 18) At his deposition, however, Reed testified that his discussions with Freedberg were only "preliminary." (Joint Ex. 25, at 15) Furthermore, at this meeting, Freedberg informed Reed that anything the parties discussed was subject to the approval of William A. Kenawell, General Counsel for CEI. (Joint Ex. 27, ¶ 5) Freedberg also testified that she told Reed that a formal written contract would be required and that it would be negotiated with Kenawell. (Joint Ex. 7, ¶¶ 6, 10) Reed, on the other hand, testified that he believed that a formal writing was unnecessary. (Joint Ex. 27, ¶ 6)
At the conclusion of her meeting with Reed, Freedberg drafted a start sheet for Jimmy Jolly and entered it into CEI's system. (Joint Ex. 22) It referenced a projected start date for Jolly at Pepsi of January 15, 2001. (Joint Ex. 22) Two days later, on December 14, 2000, Kenawell faxed Jotorok a cover letter and a proposed "Agreement for Consulting Services" ("Agreement"). (Joint Ex. 12) In his cover letter, Kenawell wrote that "This is to confirm that Jimmy Jolly will begin a contract programming assignment. . . ." Kenawell, though, requested that Jotorok review the agreement, sign it, and return it to him. (Joint Ex. 12) Jotorok, however, did not immediately sign the Agreement, as it had several objections to the payment terms proposed by CEI.[6]
Due to Jotorok's objection to the payment plan, CEI and Jotorok continued to discuss the proposed Agreement. Between December 14, 2000 and January 9, 2001, the parties spoke on at least three occasions regarding the terms of the written agreement. (Joint Ex. 25, at 15-18) Kenawell testified that, on January 9, 2001, he engaged in a conference call with Reed and Ronald Wnek, President of Jotorok. According to Kenawell's testimony, Wnek informed him that Jotorok had not been paid by Pepsi for nearly six months. As Pepsi was one of Jotorok's largest clients, Kenawell became concerned that Jotorok would be unable to pay CEI in a timely manner. Kenawell testified that upon learning of Pepsi's alleged failure to timely pay Jotorok for Jolly's services, he unequivocally told both Reed and Wnek that CEI would not do business with Jotorok. Kenawell subsequently confirmed this conversation in two e-mails that he sent to Reed on January 18, 2001 in which he wrote: "As you know, as of Tuesday, January 9, 2001, CEI and Jotorok reached a mutual understanding that they could not come to an agreement regarding Mr. Jolly's services" (Joint Ex. 14) and "I explained to you in that conversation that we would not do business with you under those circumstances [failure to receive timely payments for Jolly from Pepsi]" (Joint Ex. 20). Furthermore, after this conversation on January 9, 2001, Freedberg entered a no-start sheet for Jolly in CEI's system. (Joint Ex. 13)
Contrary to CEI's assertions, both Wnek and Reed claim that neither one of them was aware that CEI was breaking off all business with Jotorok; they simply thought of this dispute as a minor one that did not affect the overall agreement between CEI and Jotorok. (Joint Ex. 27, ¶ 7, Joint Ex. 28, ¶ 7). Instead, on January 12, 2001, three days after the telephone conference, Jotorok signed the Agreement. (Joint Ex. 17) Wnek claims that he did not learn of CEI's refusal to engage in business until Pepsi informed Jotorok that CEI was not going to enter into an agreement with Jotorok. (Joint Ex. 28, ¶ 8) Jotorok claims that the first time it heard from CEI that it was not going to contract with Jotorok was on January 18, 2001. (Joint Exs. 14 and 20)
Freedberg testified that CEI, believing it had ceased doing business with Jotorok, began to discuss an agreement with Jolly and Pepsi that would allow CEI to assign Jolly directly to Pepsi after January 15, 2001. (Joint Ex. 19B) On that same date, Reed sent Kenawell an email in which he stated that CEI was free to seek other employment opportunities for Jolly as long as CEI did not attempt to place him directly with Pepsi because of Pepsi's signed contract with Jotorok that prevented Pepsi from retaining Jolly's services other than through Jotorok. (Joint Ex. 19A) CEI told Jolly that Pepsi would need to get a release from Jotorok that would allow Pepsi to directly hire Jolly from CEI. (See Joint Ex. 19B) On January 18, 2001, Jotorok sent an e-mail to Pepsi granting it the release that would allow Pepsi to obtain Jolly's services from another source other than Jotorok.[7] (Joint Ex. 15) According to the testimony of Reed and Wnek, by granting the release to Pepsi, Jotorok earned the right to continue other business with Pepsi, which was important to it, as Pepsi was one of its largest clients. Once Pepsi received the release from Jotorok, CEI entered into an agreement with Pepsi whereby CEI provided Pepsi with Jolly's services up until mid-May 2001. (Joint Exs. 16 and 30) In return, Pepsi paid CEI directly $100.00 per hour for every hour worked by Jolly.[8] (Joint Ex. 32)
Upon learning of CEI's direct assignment of Jolly to Pepsi, on June 21, 2001, Jotorok initiated this suit for breach of contract. Jotorok's complaint asserts that CEI, by refusing to provide Jolly's services to Jotorok, breached an alleged oral contract under which CEI agreed to provide Jolly to Jotorok for placement at Pepsi in return for Jotorok paying CEI $75.00 per hour for each hour worked by Jolly. Jotorok alleges that it entered into an oral contract with CEI at the December 12, 2000 meeting between Reed and Freedberg because Freedberg had either the actual or apparent authority to bind CEI to a contract. In the alternative, Jotorok contends that even if a contract were not formed on December 12, 2000, Kenawell ratified the agreement on behalf of CEI through his December 14, 2000 facsimile to Jotorok. Furthermore, Jotorok asserts that even assumingarguendo that it did not form a contract with CEI on December 14, 2000, it nonetheless finalized an agreement with CEI upon signing the Agreement on January 12, 2001. Finally, Jotorok asserts that the agreement should be enforced under the doctrine of promissory estoppel, claiming that because CEI allegedly failed to disavow the agreement until January 18, 2001, Jotorok detrimentally relied on the belief that an agreement existed.
In its defense, CEI asserts that Jotorok and it did not enter into a binding agreement on December 12, 2000 because the parties contemplated further discussions and a written agreement and because Freedberg did not have any authority to bind CEI to a contract. CEI further alleges that Kenawell's facsimile was not a ratification of the December 12, 2000 agreement but a new offer to which Jotorok never assented. Additionally, CEI argues that it revoked its offer of agreement on January 9, 2001, during the conference call, such that Jotorok's signing of the Agreement on January 12, 2001 was a nullity that could not legally bind CEI.[9]
Furthermore, CEI claims that Jotorok is estopped from bringing its complaint because CEI received a release from Jotorok (in the form of Reed's January 18, 2001 email to Kenawell indicating that Jotorok had no objection to CEI seeking other employment opportunities for Jolly other than through Pepsi) that relieved CEI from any of its responsibilities under the alleged contract. (See Joint Ex. 19A) In addition, CEI claims that Jotorok's release to Pepsi precludes Jotorok's recovery from CEI because Jotorok received a benefit from granting the release to Pepsi. Finally, according to CEI, Jotorok's complaint is barred by the doctrine of unclean hands; CEI alleges that Jotorok unethically attempted to eliminate both Crescent and TIS from their entitled profits, knowing that Jolly was contractually prohibited from working at Pepsi through any company other than TIS.
On January 16, 2003, CEI filed a third party complaint in this action against TIS. CEI alleged that under a settlement agreement between TIS and it, TIS had agreed to indemnify CEI from any lawsuit involving CEI's employment of Jolly.[10] In a stipulation filed with this Court on August 19, 2004, however, CEI agreed to dismiss its third-party complaint against TIS with prejudice. TIS is thus no longer a party to this suit.
This Court, sitting without a jury, began the trial of this matter on January 5, 2004. At trial, Jotorok presented Reed, Wnek and Kenawell as its witnesses. At the close of Jotorok's case, CEI brought a Rule 50 motion seeking judgment as a matter of law. This Court denied that motion and held that CEI had failed to demonstrate, as a matter of law, that no oral contract between it and Jotorok existed, that Freedberg lacked authority to contract, or that any liability to Jotorok was barred by the doctrines of release or unclean hands. In ruling on a motion for a judgment as a matter of law, the trial justice must view all of the evidence in a light most favorable to the adverse party and is obliged to give the party the benefit of all reasonable and legitimate inferences which may be properly drawn from such evidence. Bajakian v. Erinakes, No. 03-488-Appeal, slip op. at 8 (R.I. Sept. 2, 2005); seealso Pimental v. D'Allaire, 114 R.I. 153, 330 A.2d 62
(1975). This Court adopted that standard of review and examined the evidence in a light most favorable to Jotorok, holding that genuine factual disputes existed as to the existence of a contract and CEI's defenses.[11]
Subsequently, CEI presented its case and called Kenawell and Freedberg as witnesses. The parties also admitted into evidence numerous exhibits (most of which were marked as joint exhibits), including correspondence between the parties concerning the alleged agreement, depositions, affidavits, internal records and billing documents from CEI, and employment and assignment contracts involving Jolly, Crescent, TIS, CEI, and Jotorok. In addition, the parties submitted post-trial memoranda inclusive of proposed findings of fact and conclusions of law.
 STANDARD OF REVIEW
The standard of review for a non-jury trial is governed by Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure which provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." In a non-jury trial, "the trial justice sits as a trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184
(R.I. 1984). It is therefore the duty of the trial justice to weigh and consider the evidence, pass upon the credibility of witnesses, and draw proper inferences. Id. When a case is tried without a jury, "the task of determining credibility of witnesses is peculiarly the function of the trial justice. . . ."State v. Sparks, 667 A.2d 1250, 1251 (R.I. 1995) (citingWalton v. Baird, 433 A.2d 963, 964 (R.I. 1981)). The trial justice also may draw inferences from the testimony of witnesses in fulfilling her function. Id.;see also Rodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983) (the question of who is to be believed is one for the trier of fact).
 ANALYSIS
I. The Oral Contract
A threshold issue for this Court to address is whether the parties created a binding contract at the December 12, 2000 negotiation session between Freedberg and Reed. According to Jotorok, Reed had full authority to enter into an agreement on its behalf, and it alleges that Freedberg had similar authority, or at minimum, the apparent authority, to bind CEI. On the other hand, CEI claims that neither Reed nor Freedberg had the authority to enter into a contract on that date and that both parties contemplated that their final agreement would be memorialized in a formal written document. Additionally, CEI claims that both parties understood that any agreement would be subject to the approval of Kenawell. As Kenawell had not given his approval as of December 12, 2000, CEI contends that the parties could not have formed a contract as of that date. Based upon the evidence presented, this Court holds that Jotorok has not sustained its burden of proof in establishing that the parties agreed to an oral contract.
a. Contemplation of a Written Agreement
To hold that the parties entered into an oral contract, this Court must find that on December 12, 2000, the parties intended to bind themselves to the terms discussed. As the Rhode Island Supreme Court has held, "[t]o form a valid contract, each party to the contract must have the intent to promise or be bound."Smith v. Boyd, 553 A.2d 131, 133 (R.I. 1989) (citing J.Koury Steel Erectors, Inc. v. San-Vel Concrete Corp.,120 R.I. 360, 365, 387 A.2d 694, 697 (1978)). Although parties may discuss terms of an agreement, there may be "instances in which a party intends that his [or her] agreement to the terms of a contract will have no legal consequences." Id. Parties, for example, may not form a contract, even when they manifest their assent to certain terms, when they contemplate a future written instrument. Id. In such cases,
 when the parties to an agreement understand that the agreement is to be reduced to writing, and extensive preparation and performance has not begun, the burden of proof to show an objective intent to be bound before execution of the written contract is on that party who wishes to enforce the alleged oral contract.
Id. at 134.
This Court finds that both parties, Jotorok and CEI, contemplated that the terms discussed on December 12, 2000 would be placed in a future formal written contract. The Court is satisfied by the testimony of Freedberg that at the end of the December 12, 2000 discussions, she informed Reed that he would receive from CEI a written contract that would include the specific terms CEI requested. Furthermore, as Reed confirmed in his testimony and his affidavit, it was clear to both parties that Kenawell would have to approve the agreement to bind Jotorok. (See Joint Ex. 27, ¶ 5) While Reed did state in his testimony and affidavit that he did not believe that a formal contract would have to be signed (see Joint Ex. 27, ¶ 6), and that he believed that there was a binding oral contract between the parties as of December 12, 2000, his testimony in this regard was undercut by other aspects of his own testimony, the testimony of others and certain exhibits.
Reed testified, for example, that he needed to run the proposed agreement by Wnek just as Freedberg needed to run it by Kenawell, that they only "substantially" had an agreement, and that Jotorok "typically" enters into written agreements (although he refused to acknowledge the rather indisputable precept that signed contracts are preferable). Wnek further testified that Jotorok typically enters into oral agreements for the assignment of consultants only with clients with whom it has a longstanding relationship. As this contract would have been the initial agreement between Jotorok and CEI, and would have resulted in revenue of over eighteen thousand dollars for Jotorok and over fifty thousand dollars for CEI, this Court finds it highly unlikely that the parties would bind themselves orally without specifying all terms in a written instrument. Indeed, the proof is in the pudding: Kenawell ultimately prepared and signed a proposed written contract which he forwarded to Jotorok on December 14, 2000 (Joint Ex. 12), and Jotorok ultimately signed and returned that same written contract to CEI on January 12, 2001. (Joint Ex. 17) This Court concludes, therefore, based on the credibility of the witnesses, the weight of the evidence, and the inferences that can be properly drawn from the evidence, that the parties did indeed contemplate that their agreement would be memorialized in a formal writing.
Notwithstanding the absence of a formal written document, and even assuming that the parties intended to memorialize their agreement in such a writing, Jotorok still maintains that a binding oral contract existed on December 12, 2000. As Jotorok is the party seeking to enforce the alleged oral agreement, Jotorok carries the burden of proving that CEI intended to be bound to the terms agreed to by Freedberg and Reed, prior to the execution of a formal written agreement. See Smith,553 A.2d at 134. After examining the evidence before it, this Court determines that Jotorok has not met that burden.
Jotorok argues that under Ardente v. Horan, 117 R.I. 254,260, 366 A.2d 162, 165 (1976), "an acceptance may be valid despite conditional language if the acceptance is clearly independent of the condition." In other words, an enforceable agreement exists even if a subsequent condition has yet to occur if the parties intended to bind themselves prior to the condition's occurrence. InArdente, the plaintiffs had signed a purchase and sale agreement to buy the home of the defendant, but they indicated that they wanted the furniture in the home to be included as part of the sale. 117 R.I. at 256,366 A.2d at 163. The court held that the acceptance was not absolute as the items of furniture were part of the entire transaction. Id. at 260-61, 166. The plaintiffs were not simply making an inquiry into a collateral matter and had no intention to bind themselves prior to the condition occurring. Thus, according to Jotorok, enforcement of a contract is dependent upon whether the acceptance "is more reasonably interpreted as a qualified acceptance [where the condition must occur for the contract to become enforceable] or as an absolute acceptance together with a mere inquiry concerning a collateral matter." Id. Jotorok asserts that CEI's requirement of a formal writing was merely an inquiry into a collateral matter and that CEI already had accepted absolutely the agreement — in other words, the writing did not have to occur before the contract became enforceable. Jotorok's reliance on Ardente, however, is misplaced. While Ardente did provide an insightful distinction between qualified and absolute acceptances, it did not specifically address the issue of whether a contemplated formal writing is a collateral matter to an agreement or if it is a requirement for the parties to become bound to the agreement.[12] Instead, the Court must look to the particular facts and circumstances before it in this case to determine whether Jotorok has satisfied its burden of establishing that a written document was merely a collateral matter and that CEI intended to be bound by the December 12, 2000 negotiations.[13]
This Court finds that the written agreement was an absolute requirement. Ardente held that a condition is clearly independent of an acceptance when, "it is clear that the meaning of the acceptance is positively and unequivocally to accept the offer whether such request is granted or not. . . ." Id. at 260, 165 (citing 1 Samuel Williston, A Treatise on The Law of Contracts § 79 at 261-62 (3d ed. 1957)). Considering that Freedberg specifically told Reed that any agreement would be subject to the approval of Kenawell, clearly CEI did not unequivocally agree to be bound to the preliminary terms of the proposed agreement discussed between Freedberg and Reed. Additionally, when Kenawell faxed a draft agreement to Jotorok on December 14, 2000, he asked Jotorok to sign and return it, demonstrating CEI's intent to formally memorialize the agreement before it became binding. See John Hancock Mutual Life InsuranceCo. v. Dietlin, 97 R.I. 515, 199 A.2d 311 (1964); In reNewport Plaza Associates, 985 F.2d 640, 645 (1st Cir. 1993) ("Under Rhode Island law, . . . the offeror controlled the offer and the terms of its acceptance.") When Wnek at first delayed and then ultimately signed the agreement, Jotorok, too, manifested an intent to be bound only by a written agreement. Furthermore, Reed testified at trial that Jotorok and CEI only "substantially" had an agreement as of December 12, 2000. According to his deposition testimony, which he acknowledged at trial, he believed the negotiations with Freedberg were "preliminary."[14] (See Joint Ex. 25, at 15). If the discussions were considered by Jotorok to be preliminary and incomplete, there was no manifested intention to be bound by them. Indeed, the parties' continued negotiations after December 12, 2000 and through early January 2001 are further evidence that no agreement had yet been reached. Therefore, Jotorok has not met its burden of showing that CEI intended to be bound prior to a written contract; as such, this Court cannot say that the parties formed a binding oral contract.
b. Actual or Apparent Authority
Even assuming, arguendo, that Reed and Freedberg intended to enter into an oral agreement on behalf of Jotorok and CEI on December 12, 2000, both representatives first would have had to have had the authority to bind their employers to such a contract.See Lawrence v. Anheuser-Busch, Inc., 523 A.2d 864, 867
(R.I. 1987). Without authority to bind the principal, the principal will not be bound by the acts of its agents, even if the agents had intended to enter an agreement. Id. Here, Jotorok claims that Freedberg had either the actual or apparent authority to contract on behalf of CEI. CEI contends that Freedberg did not have the authority to contract on its behalf, and further asserts that Reed also did not have authority to bind Jotorok at the time he and Freedberg negotiated. The evidence before this Court demonstrates that Freedberg did not have either the actual or apparent authority to bind CEI on December 12, 2000 such that no oral contract could have been created between CEI and Jotorok on that date.
The Restatement (Second) of Agency defines actual authority as "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestation of consent to him [or her]." Restatement (Second) of Agency, § 7 (1958). Actual authority arises upon "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him [or her] so to act on the principal's account."[15] Id. at § 26. Further, "the manifestations to the agent can be made by the principal directly, or by any means intended to cause the agent to believe that he [or she] is authorized or which the principal should realize will cause such belief." Id. at § 26 cmt. b.
Freedberg did not have the actual authority to bind CEI to a contract on December 12, 2000. Both Freedberg and Kenawell testified convincingly that on December 12, 2000, all authority for entering into contracts on behalf of CEI was solely in the hands of Kenawell. Additionally, during the meeting, Freedberg expressed to Reed that their agreement would be subject to Kenawell's approval. CEI gave no indication to Freedberg that she had the authority to bind the company — in fact, she herself stated that the agreements required Kenawell's approval. Thus, because the agent herself did not believe that the principal, CEI, desired her to enter a contract on its behalf, Freedberg did not have actual authority to bind CEI.[16]
Although Freedberg did not have the actual authority to create a binding agreement between Jotorok and CEI, Jotorok alleges that Freedberg had the apparent authority to form a contract on behalf of her employer. This Court finds, however, that Freedberg did not have the apparent authority to bind CEI to a contract regarding the services of Jimmy Jolly.
The Supreme Court of Rhode Island has had many opportunities to address the requirements needed to establish apparent authority. The Court has stated:
 To establish the apparent authority of an agent to do a certain act, facts must be shown that:
 [1] the principal has manifestly consented to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority;
 [2] that a third person knew of the fact and, acting in good faith had reason to believe and did actually believe that the agent possessed such authority; and
 [3] that the third person, relying on such appearance of authority, has changed his [or her] position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.
Calenda v. Allstate Insurance Co., 518 A.2d 624, 628 (R.I. 1986) (citingSoar v. National Football League Players Ass'n, 438 F.Supp. 337, 342
(D.RI. 1975)).
When a party raises the issue of apparent authority seeking to bind a principal to the acts of the agent, the party alleging apparent authority has the burden of proving that the agent had apparent authority to act on the principal's behalf. American Title Ins. Co. v. East West FinancialCorp., 817 F. Supp. 251, 258 (D.R.I. 1993). Furthermore, "the existence and scope of an agency relationship is essentially a factual determination." Petrone v. Davis, 118 R.I. 261, 266, 373 A.2d 485, 488
(1977). Thus, because this is a non-jury trial, it is the duty of this Court to determine, under the facts presented, whether Freedberg had the apparent authority to enter into an agreement on December 12, 2000 on behalf of CEI, as alleged by Jotorok.
To bind the principal (CEI) to the acts of its agent (Freedberg), Jotorok has the burden of persuading this Court that Freedberg had apparent authority. See American Title, 817 F. Supp at 258 (". . . the rubric that a third party who seeks to charge a principal for the acts of an agent has the burden of proving the agent's authority is one that has become deeply embedded in black letter law"). Jotorok alleges that Freedberg said or did nothing to give Reed the impression that she did not have the authority to negotiate on behalf of CEI on December 12, 2000. (Joint Ex. 27) However, Jotorok has failed to show that "the principal [CEI] has manifestly consented to the exercise of such authority or has knowingly permitted the agent [Freedberg] to assume the exercise of such authority." Calenda, 518 A.2d at 628. No one with authority at CEI, including Kenawell, manifestly took any action to demonstrate that Freedberg had authority to enter into a contract.
More importantly, at the December 12, 2000 meeting, Freedberg herself clearly did not even assume such authority as she articulated that her authority was limited. She told Reed that Kenawell would have to approve of any terms they discussed. As Reed conceded that Freedberg told him that Kenawell would have to approve the agreement, as Reed never testified that he believed Freedberg had the authority to enter into a contract,[17] and as Reed stated that his discussions were only with Kenawell after his preliminary discussions with Freedberg, Jotorok has failed to demonstrate that it or its agents "had reason to believe and actually did believe that the agent [Freedberg] possessed [the] authority" to bind CEI by contract. Id. Therefore, because Jotorok has not provided this Court with sufficient evidence to sustain its burden of proving Freedberg's apparent authority to enter into a contract, this Court finds that Freedberg did not have the apparent authority to bind CEI to any agreement with Jotorok on December 12, 2000.
II. Ratification
Jotorok further argues, in the alternative, that even if it did not form an oral contract with CEI on December 12, 2000 because Freedberg lacked the actual or apparent authority to enter into that contract, CEI ratified the agreement by its subsequent actions, thereby binding itself to the terms discussed on that date. Jotorok contends that Kenawell ratified the agreement on behalf of CEI by accepting the benefits of the agreement and by sending to Jotorok a facsimile on December 14, 2000 stating that CEI "confirms" Jolly's assignment.[18] Jotorok argues that by using the phrase "confirm," CEI clearly indicated its intent to ratify the prior discussion. However, for the reasons set forth below, this Court holds that the actions of Kenawell did not amount to ratification of the terms discussed between Reed and Freedberg at the December 12, 2000 meeting.
"Ratification means the adoption or confirmation by one person of an act performed on his [or her] behalf by another without authority."Kesselman v. Mid-States Freight Lines, Inc., 78 R.I. 518, 520, 82 A.2d 881,882 (1951). Ratification can occur when "the principal has knowledge of the facts and accepts a benefit even when the act of the agent may have been unauthorized." Newport Oil Corp. v. Viti Bros., 454 A.2d 706, 708
(R.I. 1983) (citing Kesselman, 78 R.I. at 520, 82 A.2d at 882). When a principal ratifies a contract, he or she is as bound as he or she would have been had prior authorization been granted. Kesselman, 78 R.I. at 521,82 A.2d at 882. However, "to constitute a valid ratification . . . the principal ordinarily must have full knowledge of all the material facts and circumstances relating to the unauthorized act at the time of confirmation." Id.
Jotorok's argument that Kenawell ratified the discussion between Freedberg and Reed fails to take into account the entire context and content of Kenawell's facsimile. Included with the cover letter that contained the language "confirm," Kenawell attached a copy of its "Agreement for Consulting Services." Kenawell asked Jotorok to review and sign that agreement. Several terms in the Agreement were different or additional to the terms that were discussed between Reed and Freedberg. The form sent by CEI, for example, included a unique payment system that required payments upon receipt of invoices, payment of interest if invoices were not paid in five days, and gave CEI the right to collect directly from the end-client if payments on any invoice were more than twenty days late. Furthermore, the Agreement contained a jurisdiction clause granting Pennsylvania exclusive jurisdiction to resolve disputes under the Agreement, as well as a termination clause under which either party could terminate the Agreement upon thirty days' notice. This Court has not been presented with any evidence that indicates that any of these provisions were even discussed at the December 12, 2000 meeting.
This Court may infer from these circumstances that CEI intended the Agreement to serve as the contract between itself and Jotorok. Ratification, however, requires adoption or confirmation of an act performed by another. Kesselman, 78 R.I. at 520, 82 A.2d at 882. At the December 12, 2000 meeting, Freedberg did not propose an agreement with the same terms as the "Agreement for Consulting Services" that Kenawell sent on December 14, 2000. Thus, CEI was not confirming or adopting anything which Freedberg had negotiated; rather, by sending a facsimile of its own contract that had terms different from those discussed on December 12, 2000, it was instead proposing its own contract. See JohnHancock Mutual Life Insurance Co., 97 R.I. at 517-18, 311 A.2d at 312-13.
Furthermore, there is no evidence to indicate that CEI ratified the agreement by accepting any benefit from the discussions of December 12, 2000 during which Freedberg represented it. Again, CEI proposed its own agreement in the facsimile it sent to Jotorok on December 14, 2000 and was not taking advantage of any previous oral representations made by Freedberg. This Court determines, therefore, that CEI did not act in any way that constituted ratification of the December 12, 2000 agreement.
III. Revocation of the Offer
Having concluded that Jotorok and CEI did not enter into a binding agreement on December 12, 2000 and that CEI did not subsequently ratify that agreement, this Court next turns to the issue of whether CEI effectively revoked the offer it made to Jotorok on December 14, 2000, prior to Jotorok's acceptance of that offer. After considering the testimony and evidence presented, this Court holds that CEI indeed revoked its offer prior to Jotorok's acceptance. Once CEI revoked its offer, nothing remained for Jotorok to accept; thus, the parties never entered into a binding contract.
Basic contract law states that in order to have a valid binding contract, there must be both an offer and an acceptance. "Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed."Smith, 553 A.2d at 133 (citing Ardente, 117 R.I. at 258-59,366 A.2d at 165-66). Once an offer is made, however, the offeror has the "right . . . to terminate his offer by withdrawing it at any time before acceptance." Merritt Land Corp. v. Marcello, 110 R.I. 166, 172,291 A.2d 263, 267 (1972). Once the offeror withdraws its offer, the offeree has nothing to accept; its subsequent attempt to accept the withdrawn offer is thus a nullity. Id.
As no binding contract existed between the parties when Kenawell sent the facsimile of CEI's "Agreement for Consulting Services" to Jotorok, the Agreement was an offer to enter into a contract, which Jotorok could either accept or reject. In his cover letter, Kenawell specifically asked Jotorok to review the Agreement for signature and "sign the faxed copy and return it via fax to me today." (Joint Ex. 12) This language demonstrates CEI's intention to obtain the signature of someone with authority at Jotorok to accept the offer. No one from Jotorok, however, immediately signed the Agreement. Instead, the parties spoke on at least three separate occasions thereafter regarding the terms of the proposed agreement, including Jotorok's objection to the payment plan that CEI had included in its offer. Despite these discussions, as of January 9, 2001, Jotorok had yet to sign the Agreement and therefore had yet to accept CEI's offer.
Kenawell testified that the parties held a telephone conference on January 9, 2001, during which he indicated to Jotorok that CEI was no longer interested in doing business with the company. On the other hand, Jotorok contends that, at the time, it was not clear that CEI was revoking its offer. Both Reed and Wnek assert that on January 9, 2001, neither one of them understood or acknowledged that CEI intended to withdraw, or in fact had withdrawn, its offer. Thus, they claim that when Jotorok thereafter signed the Agreement on January 12, 2001, they were under the impression that the offer was still valid and they were properly accepting that offer.
This Court is thoroughly convinced by Kenawell's testimony that on January 9, 2001, he made it unmistakably clear to Wnek and Reed that CEI was revoking its offer and was no longer interested in doing business with Jotorok. The professed lack of recall of that conversation by Reed and Wnek at trial was not persuasive. This conclusion is further supported by the "no-start" form Freedberg entered into CEI's system on January 9, 2001. Additionally, drawing proper inferences, this Court finds that Jotorok was clearly aware that the Agreement had been revoked when it attempted to accept it by signing it on January 12, 2001. Prior to January 9, 2001, Jotorok had been adamant in its disapproval of the payment terms proposed by CEI, claiming that such terms were onerous. Only three days after Kenawell's alleged revocation, however, Jotorok readily signed the Agreement, subjecting itself to all of the terms CEI had proposed, including the "onerous" payment plan. This Court finds that Jotorok signed the Agreement simply in an attempt to bind CEI, knowing that CEI had already revoked its offer. Its attempt at acceptance, however, was too late to have any effect.
As the Rhode Island Supreme Court held in Merritt Land, an offeror has a right to withdraw an offer before an acceptance, and if the offer is withdrawn prior to the attempted acceptance, the attempted acceptance is a nullity. 110 R.I. at 172, 291 A.2d at 266-67. Here, Jotorok had not accepted CEI's offer before CEI withdrew that offer on January 9, 2001. As this Court has found, CEI clearly communicated the revocation to Jotorok, making the revocation effective. Consequently, there remained nothing for Jotorok to accept. This Court finds, therefore, that Jotorok's signing of the Agreement was a nullity, precluding the formation of a contract.
IV. Promissory Estoppel
Jotorok asserted a claim against CEI based on the doctrine of promissory estoppel. Jotorok alleges that it detrimentally relied on the promise by CEI to form a contract, CEI realized Jotorok would rely detrimentally on its promise, and enforcement of the agreement is thus necessary to prevent injustice. This Court holds, however, that despite Jotorok's assertions, it has not demonstrated that all of the elements of promissory estoppel have been satisfied.
Under the doctrine of promissory estoppel, "`a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of its promise.'" East Providence CreditUnion v. Geremia, 103 R.I. 597, 601, 239 A.2d 725, 727 (1968) (quoting Restatement of Contracts, § 90). The party who asserts promissory estoppel has the burden of proving that all of its elements have been established. Lichenstein v. Parness, 81 R.I. 135, 138-39, 99 A.2d 3, 5
(1953). Here, Jotorok has failed to come forward with sufficient evidence to demonstrate that it acted in forbearance on CEI's promise to enter into an agreement. Furthermore, this Court finds that any detriment experienced by Jotorok resulted from its own inaction. On December 14, 2000, only two days after the Reed-Freedberg negotiation, CEI sent Jotorok a written offer which Jotorok easily could have accepted by signing at that time. Any detriment that Jotorok may have suffered after that time was of its own creation.[19] See In re Pioneer Ford Sales,Inc., 30 B.R. 458, 463 (D.R.I. 1983), rev'd on other grounds, 729 F.2d 27
(1st Cir. 1984) (holding that the doctrine of equitable estoppel would not apply in favor of a party who had slept on his rights). Thus, there is no evidence that injustice would occur if this Court were to refuse to enforce the agreement. As Jotorok has not established the necessary elements of promissory estoppel, this Court holds that CEI was not estopped from revoking its December 14, 2000 offer and refusing to do business with Jotorok.
 CONCLUSION
This Court finds that CEI and Jotorok did not enter into an oral contract on December 12, 2000. Furthermore, this Court determines that CEI did not subsequently ratify the agreed-upon terms negotiated between Freedberg and Reed on that date. On the contrary, on December 14, 2000, CEI made an offer to Jotorok in the form of a proposed written contract which Jotorok was free to accept or reject. Before Jotorok accepted the Agreement, CEI effectively revoked its offer. This Court finds, therefore, that a valid contract was never entered into between CEI and Jotorok. As no contract existed between the parties, this Court must reject Jotorok's claim for breach of contract.[20]
Accordingly, judgment shall enter for defendant CEI on plaintiff Jotorok's first amended complaint for breach of contract. Counsel shall confer and submit to the Court forthwith for entry an agreed upon form of order and judgment that is reflective of this Decision.
[1] The facts are drawn largely from the trial exhibits in this case, as referenced in this Decision, as well as from the trial testimony and the parties' proposed findings of fact. Many of the factual findings in this Decision that are supported by references to the trial exhibits are also supported by the trial testimony and the parties' undisputed facts, although no specific references have been made to any trial transcript as the trial proceedings have not yet been transcribed.
[2] Profession level foreign employees may seek employment in the United States though the H1B visa program. The H1B visa enables United States employers, as visa sponsors, to hire foreign workers in specialty occupations for a specified period of time. See 8 C.F.R. § 214.2 (h) (2005).
[3] In March, 2000, TIS, in fact, filed a complaint against CEI and Jolly in the Superior Court of New Jersey, Middlesex County, Chancery Division. The complaint alleged that CEI had tortiously interfered with TIS's employment agreement with Jolly. The parties, however, settled the matter in May 2001. See Third Party Complaint, Exh. A.
[4] CEI relies on a January 18, 2001 letter from Richard Reed at Jotorok in which he wrote, ". . . Jimmy's former H1B agency [Crescent] who worked with us on the Pepsi placement also has a contractual restriction on him accepting employment there through a different source." (Joint Ex. 29).
[5] At the time, Reed's position at Jotorok was that of contract manager, while Freedberg's title was regional program manager. (Joint Exs. 27, 2).
[6] The Agreement drafted by Kenawell contained CEI's "mini-multiplier" agreement, under which Jotorok would have been required to make payments immediately upon receipt of invoices, would have had to pay interest on invoices five days overdue, and gave CEI the right to collect directly from the end client if Jotorok was over 20 days late on any invoice. Kenawell testified that he included the "mini-multiplier" payment provisions because he was concerned that Jotorok's small size would make it difficult for Jotorok to obtain significant credit.
[7] The release originally permitted Pepsi to utilize Jolly's services up until May 15, 2001 (Joint Ex. 15), but was subsequently extended to May 18, 2001. (Joint Ex. 30).
[8] In total, Pepsi paid CEI $73,400.00 for Jolly's services between January 15, 2001 and May 18, 2001. (Joint Ex. 32).
[9] CEI also filed a complaint in the Court of Common Pleas of Allegheny County Pennsylvania seeking a declaratory judgment that Pennsylvania had exclusive jurisdiction to resolve this contract dispute based on the jurisdiction clause in the Agreement. The court dismissed the suit. See Memorandum in Support of Plaintiff's Objection to Summary Judgment.
[10] TIS and CEI settled a claim brought by TIS for tortious interference with contract. See supra n. 3.
[11] Defendant CEI did not renew its Rule 50 motion for judgment as a matter of law either at the close of all of the evidence in the case or post-trial and, as such, its motion is waived. See Skaling v. Aetna Ins.Co., 742 A.2d 282 (R.I. 1999). Regardless, this Court has proceeded to decide this case based upon all of the evidence presented.
[12] Jotorok also cited to Greensleeves, Inc. v. Smiley, 694 A.2d 714
(R.I. 1997), for the proposition that even though CEI contemplated a writing, it still absolutely accepted the agreement. The Supreme Court inGreensleeves held: "`the fact that a writing refers to a formal document to be executed in the future does not automatically prevent the initial writing from being binding.'" Id. at 716 (citing Gel Systems, Inc. v.Hyundai Engineering Construction Co., 902 F.2d 1024, 1027 (1st Cir. 1990)). However, the facts of that case are distinguishable from this case. There, the parties had already generated a written document (a letter) that contained all of the essential terms of the agreement. Id.
The document simply stated that the parties would place the terms of the letter into a more formal document. Id. at 715. In the case here, however, no prior written agreement existed to bind the parties.Greensleeves stands for the proposition that a contemplated formal writing may not necessarily extinguish the intent to be bound when a writing containing all of the essential terms of a contract already exists. This holding does not apply to the matter here where no writing existed at the time the parties contemplated a formal document.
[13] "In determining whether a party's objective intent was to be bound before or upon execution of the written contract, one must examine the particular case." Smith, 553 A.2d at 134.
[14] This deposition was taken in connection with litigation pending in the Court of Common Pleas of Allegheny County, Pennsylvania. CEI had filed a complaint against Jotorok seeking declaratory judgment from that court to declare that Pennsylvania, and not Rhode Island, had jurisdiction to resolve the breach of contract dispute, pursuant to the choice of law clause contained in the "Agreement for Consulting Services." Reed later contended that because the deposition was limited to the jurisdiction issue, he was not provided the opportunity to explain what he meant by "preliminary." (Joint Ex. 27) However, this Court notes that, as he was adequately represented by counsel during the deposition, and as he was able to testify in part as to what the discussions regarded, Reed could have clarified what he meant by the term "preliminary" at his deposition had he wanted to do so. More importantly, although Reed attempted to explain at trial that he meant "preliminary in terms of time" as opposed to "preliminary to a written agreement," this Court places no credence in that explanation.
[15] "The fact that the principal is willing that another shall act on his [or her] account and that the other so believes does not create authority; there must be a manifestation by conduct coming from the principal and coming to the knowledge of the agent." Restatement (Second) of Agency, § 26 cmt. a (1958).
[16] CEI alleges further that Reed did not have the actual authority to enter a contract on behalf of Jotorok. The parties dispute whether Wnek gave Reed the authority to enter a contract before or after the December 12, 2000 meeting. However, as this Court has held that Freedberg did not have the authority to enter into an agreement on that date, and as a contract requires both parties to have the authority to enter into such contract, this Court need not determine whether Wnek had given authority to Reed prior to Reed's conversation with Freedberg. Freedberg's lack of authority alone is sufficient to negate any contract formation.
Furthermore, there is evidence that, as of December 12, 2000, Reed did not have the authority to enter into a written contract with CEI that the parties contemplated (as opposed to the authority to negotiate the preliminary terms of such an agreement). After all, he testified that he would run proposed contracts by Wnek before they could go forward, Wnek could not state affirmatively in his testimony that he gave Reed authority to sign a written contract, and Wnek, and not Reed, signed all of the contracts in evidence in this case (see Joint Exs. 10, 11 and 17) as well as had prepared for his signature various form contracts in evidence here (see Deft's Ex. A). Regardless of whether Reed had the authority to enter into a written contract with CEI, however, Wnek clearly ratified the actions of his agent through his subsequent attempts to enforce the agreement.
[17] During his deposition, as conceded by Reed at trial, he testified that he believed the negotiations were merely "preliminary discussions." (See Joint Ex. 25).
[18] The facsimile, dated December 14, 2000, stated: "This is to confirm that Jimmy Jolly will begin a contract programming assignment. . . ." (Joint Ex. 12).
[19] CEI had legitimate reasons to revoke its offer. According to Jotorok, Pepsi had not paid Jotorok for several months. As Pepsi was one of Jotorok's largest clients and as Jotorok conveyed its concerns about Pepsi's slow paying to CEI, CEI was concerned about Jotorok's ability to pay CEI in a timely manner. As CEI had valid reasons to revoke its offer to contract under these circumstances, it cannot be said that injustice would occur if the agreement were not enforced.
[20] Additionally, as this Court has found that CEI and Jotorok did not enter into a binding contract, it need not decide whether Jotorok was estopped from bringing its contract claim because of the release it executed granting Pepsi permission to hire Jolly from an agency other than Jotorok (see Joint Exs. 15 and 30) or because it told CEI, in essence, that it was free to seek other employment opportunities for Jolly as long as it did not run afoul of Jotorok's contract with Pepsi that was the subject of that release (see Joint Ex. 19A). Similarly, because this Court has determined that an enforceable agreement between CEI and Jotorok did not exist, this Court need not address whether Jotorok's contract claim is barred by the doctrine of unclean hands.